**FILED**

NOV – 7 2001

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----ooOoo----

JOHN P. BAIRD, et al.,

Plaintiffs,

v.

STEPHEN KESSLER, et al.,

Defendants.

NO. CIV. S-00-1619 WBS/PAN

MEMORANDUM AND ORDER

----ooOoo----

Plaintiffs and consenters (collectively "plaintiffs") sue defendants Stephen Kessler, et al. for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. section 201 et seq.[1] Plaintiffs and defendants each move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

///

///

---

[1]   29 U.S.C. section 216(b) allows for employees to opt-in to an FLSA action by filing consent forms in the court in which the action is pending.  See 29 U.S.C. § 216(b).

1

31

I.    Factual and Procedural Background [2]

      A.    The Parties

            Plaintiffs in this case were all employed during the relevant time period as correctional officers in the Transportation Unit of the California Department of Corrections ("CDC"), transporting inmates and parolees between prisons, county jails, prison reception centers, community correctional facilities, and to legal and medical appointments.

            Defendants are nine CDC managers, purportedly sued in their individual capacities for violations of the Fair Labor Standards Act ("FLSA").  Collectively defendants represent the chain of command from the Chief of Transportation, up to the Director of the CDC.  In addition, plaintiffs have named the Deputy Director of the Administrative Services Division, not in the aforementioned chain of command, but responsible for maintaining employee records for the Transportation Unit.[3]

///

///

---

[2]    Facts discussed herein are drawn from the 43-page Joint Statement of Undisputed Facts filed by the parties concurrently with these motions.

[3]    The defendants are as follows: (1) Stephen Kessler, Deputy Director of the Administrative Services Division of the CDC; (2) Tom Goughnour, Chief of the CDC Transportation Unit until July 1999; (3) Steve Dizmon, Acting Chief of the Transportation Unit since approximately July 1999; (4) Ruth Melrose, Chief of the CDC Institution Operations; (5) Bill Dieball, Assistant Deputy Director of the CDC Institution Operations and Programs; (6) Edward S. Alameida, Jr., Acting Assistant Deputy Director, CDC Institution Operations and Programs, since approximately October 1999; (7) Dave Tristan, CDC Deputy Director, Institutions Division; (8) Steven Cambra, Jr., CDC Chief Deputy Director, Field Operations, and (9) Cal A. Terhune, Director of Corrections for the CDC.

B. <u>State of California Payroll Practices and the 98-99 MOU</u>

Pursuant to the FLSA, state employee compensation is calculated within the framework of "work periods" and "pay periods."  The FLSA defines "work period" as the recurring amount of time for which overtime is due after a certain number of hours worked.  The term "pay period" refers to the regular period for which employers pay wages.  "Work period" is a term of art distinct from and not necessarily coterminous with pay period. 29 C.F.R. §§ 553.224, 553.230, 553.233, 778.105.

In California, the salary for State employees, including those employed in the CDC, is calculated based on twelve pay periods in a calendar year, with each pay period approximating a single month.  "Pay days" occur on the last day of each pay period.  Historically, California considered one week to be a work period, and thus, each hour worked in excess of 40 hours in one week was considered overtime under the FLSA. Commensurate with this work period framework, the CDC calculated overtime compensation for each week in the pay period.  The information was then gathered at the close of the pay period and overtime compensation checks were issued around the 15th of the month following the close of the pay period.

Then, in 1998, after a period of collective bargaining between the CDC and the California Correctional Peace Officers Association ("CCPOA"), the work period for plaintiffs was modified to a 28-day work period, as reflected in the 98-99 Memorandum of Understanding ("98-99 MOU").   Plaintiffs would now receive overtime compensation for any hour worked in excess of 168 hours in a 28-day work period.  (Pls.' Ex. A, Attached to

3

1  Pls.' Mot.)  Such a work period is contemplated in section 207(k)
2  of the FLSA, and is referred to as the "7(k) exemption."  The
3  7(k) exemption allows certain correctional personnel to define
4  their work period up to 28 days long, and the employer is not
5  obligated to pay overtime for up to 171 hours worked in the work
6  period.[4]  29 U.S.C. § 207(k).

7          Thus, the 98-99 MOU set a new work period for purposes
8  of overtime calculations, the 28-day work period, but it did not
9  alter the State's long-used system of collecting time sheets at
10  the end of the pay period.  As a result, plaintiffs now have 13
11  work periods in a year, and the work periods no longer coincide
12  with the pay periods.  With the new system, as the calendar year
13  progresses plaintiffs' work periods begin ending several days,
14  even weeks, before the end of their pay periods.

15          The State, however, continues to collect plaintiffs'
16  time sheets at the end of each pay period, issuing only 12
17  overtime checks annually, as it has been doing for 70 years under
18  the old system of calculating overtime.  Consequently,
19  plaintiffs' overtime checks are issued farther and farther away
20  from the work period in which the overtime was actually earned.

21          Difficulties in ensuring the timely payment of overtime
22  checks, however, are not unique to the new 28-day work period
23  system.[5]  Even prior to the 28-day work period, the CDC realized

24

25      [4]     The 28-day work period is often referred to as the 7(k)
26  work period.

27      [5]     The CDC's position is that if the overtime checks were
   late, it was because the system for calculating overtime was not
28  automated and because the Administrative Services Division was
   understaffed and there was a state-wide hiring freeze.

                                    4

that it was not always paying its employees their overtime
compensation by the 15th of the month that followed the pay
period in which the overtime was earned.  As a result, the CDC
and the CCPOA agreed that the following provision would appear in
all future MOUs, including the 98-99 MOU:

> 11.06 Overtime Checks
>
> Each institution shall make its best effort to
> process employees' overtime checks in the shortest
> possible time.  Overtime checks shall be released to
> the employee as soon as possible following their
> receipt and expeditious processing at the
> institution/facility/camp office.
>
> Upon notice from the CCPOA, the State agrees to meet
> at a job site where issuance of overtime checks is
> consistently beyond the 15th of the month for the
> purpose of developing a mutually acceptable check
> distribution process.  Part of this process may include
> Express Service (mail, delivery service, or personal
> service) to the Controller's Office and, if possible,
> from the Controller's Office.

(Pls.' Ex. A, Attached to Pls.' Mot.).

Mindful of the administrative difficulties inherent in
grafting the new 28-day work period onto the historical system of
collecting time sheets at the end of the pay period, the CDC and
the CCPOA also negotiated the inclusion of Sideletter #7 into to
the 98-99 MOU.  It provides as follows:

> The parties agree that upon ratification through May 1,
> 1999, Section 11.06 shall be held in abeyance.
> Management agrees that during this period overtime
> checks shall be released as soon as possible, but no
> later than the 25th day of the month following the pay
> period in which the overtime was earned.  Effective May
> 1, 1999, Section 11.06 shall be reinstated in its
> entirety and this sideletter shall expire.

(Pls.' Ex. A, Attached to Pls.' Mot.).

///

///

5

1    C.    Plaintiffs' Complaint and Motion for Summary Judgment

2         On November 14, 2001, plaintiffs filed their first
3  amended complaint alleging that defendants, in their individual
4  capacities, violated the FLSA by failing to timely pay plaintiffs
5  their overtime compensation.  In addition, plaintiffs allege that
6  defendants, in their individual capacities, violated the FLSA by
7  failing to timely pay plaintiffs' retroactive overtime pay
8  increases.[6]  Plaintiffs seek the following relief for each of the
9  approximately 121 plaintiffs: (1) liquidated damages in an amount
10 equal to 100% of each late overtime check; (2) liquidated damages
11 equal to 100% of the total retroactive overtime pay increase; (3)
12 pre and post judgment interest; and (4) reasonable attorneys'
13 fees and costs.

14 III.   Discussion

15        The court must grant summary judgment to a moving party
16 "if the pleadings, depositions, answers to interrogatories, and
17 admissions on file, together with the affidavits, if any, show
18 that there is no genuine issue as to any material fact and that
19 the moving party is entitled to judgment as a matter of law."
20 Fed. R. Civ. P. 56(c).  The party adverse to a motion for summary
21 judgment may not simply deny generally the pleadings of the
22 movant; the adverse party must designate "specific facts showing
23 that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e);
24 see Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Simply put,
25 "a summary judgment motion cannot be defeated by relying solely
26 on conclusory allegations unsupported by factual data."  Taylor

27

28        [6]    The retroactive wage increase is reflected in the 99-01
   MOU.

6

1  v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  The non-moving
2  party must show more than a mere "metaphysical doubt" as to the
3  material facts.  Matsushita Elec. Indus. Co. v. Zenith Radio, 475
4  U.S. 574, 587 (1986).

5        A.  The FLSA

6            The FLSA was passed in 1938 and, in its original form,
7  did not apply to states or their political subdivisions.  The Act
8  purported to be an "exercise by Congress of its power to regulate
9  commerce among the several States ...."  29 U.S.C. § 202(b).  The
10 FLSA's purpose was to achieve "certain minimum labor standards."
11 Mitchell v. Robert De Mario Jewelry, Inc., 361 U.S. 288, 292
12 (1960).  Included in those minimum labor standards was
13 compensation for overtime work.  See Overnight Motor Transp. Co.
14 v. Missel, 316 U.S. 572, 577-78 (1942).

15           In 1974, Congress broadened the coverage of the FLSA,
16 allowing for an action to be maintained against a public agency,
17 see 29 U.S.C. § 216(b), and defining "public agency" to include
18 "the government of a State or political subdivision thereof" and
19 "any agency of ... a State, or political subdivision of a State,"
20 29 U.S.C. § 203(x).  Thus, suits could thereafter be brought
21 against states, their agencies, and political subdivisions, in
22 federal court so long as the states had unambiguously waived
23 their sovereign immunity.  Seminole Tribe of Florida v. Florida,
24 517 U.S. 44 (1996).

25           In accordance with Seminole Tribe, because California
26 has not expressly waived its sovereign immunity under the FLSA,
27 plaintiffs could not have brought this suit against the State.
28 See, e.g., Alden v. Maine, 527 U.S. 706, 757 (1999).

                                   7

1  Furthermore, plaintiffs could not have brought this suit against
2  these defendants in their official capacity because such a suit
3  would also be barred by the Eleventh Amendment.   Id.
4  Consequently, plaintiffs drafted their complaint to identify this
5  as a suit against these defendants only in their individual
6  capacity.   In order for such a claim to survive, however,
7  plaintiffs must first establish that these individual state
8  officers are "employers," as that term is used in the FLSA.   29
9  U.S.C. § 203(d); see Bonnette v. California Health and Welfare
10 Agency, 704 F.2d 1465, 1468 (9th Cir. 1983) (finding that in
11 order for the FLSA to apply, the defendant must be an "employer"
12 within the meaning of the FLSA).

13       B.   Whether Defendants are Employers Under the FLSA

14            Under the FLSA, "'employer' includes any person acting
15 directly or indirectly in the interest of an employer in relation
16 to an employee ...." 29 U.S.C. § 203(d).   The Ninth Circuit has
17 interpreted this to be a definition of "employer" that is "not
18 limited by the common law concept of [an] 'employer.'" Id. at
19 1469.   Further, the term employer "is to be given an expansive
20 interpretation in order to effectuate the FLSA's broad remedial
21 purposes." Id.

22            "The determination of whether an employer-employee
23 relationship exists, [however,] does not depend on 'isolated
24 factors but rather upon the circumstances of the whole
25 activity.'" Id. (quoting Rutherford Food Corp. v. McComb, 331
26 U.S. 722, 730 (1947)).   Thus, the Supreme Court has stated that
27 "the touchstone is 'economic reality.'" Bonnette, 704 F.2d at
28 1469 (quoting Goldberg v. Whitaker House Cooperative, Inc., 366

8

1  U.S. 28, 33 (1961)).  Additionally, it is possible for "two or
2  more employers to jointly employ someone for purposes of the
3  FLSA."  Bonnette, 704 F.2d at 1469 (citing Falk v. Brennan, 414
4  U.S. 190, 195 (1973)).  Under the FLSA, all such joint employers
5  are individually responsible for compliance with the terms of the
6  FLSA.  Bonnette, 704 F.2d at 1469 (citing 29 C.F.R. § 791.2(a)
7  (1981)).

8         In order to assist the district courts in divining the
9  existence of an employer-employee relationship, the Ninth Circuit
10 has established what it refers to as "a useful framework."
11 Bonnette, 704 F.2d at 1470.  Although, "not etched in stone," the
12 Ninth Circuit has stated that the following factors should be
13 considered in making such a determination: (1) whether the
14 alleged employer had the power to hire and fire the employees;
15 (2) whether the alleged employer supervised and controlled
16 employee work schedules or conditions of employment; (3) whether
17 the alleged employer determined the rate and method of payment;
18 and (4) whether the alleged employer maintained employment
19 records.  Id.

20         In addition, this court agrees that:

21        too much weight cannot be put on the Act's broadly
          inclusive definition of "employer."  Taken literally
22        and applied in this context it would make any
          supervisory employee, even those without any control
23        over the corporation's payroll, personally liable for
          the unpaid or deficient wages or other employees.  It
24        makes more sense, ..., to interpret the language as
          intended to prevent employers from shielding themselves
25        from responsibility for the acts of their agents.

26 Donovan v. Agnew, 712 F.2d 1509, 1513 (1st Cir. 1983).  Applying
27 the Ninth Circuit's framework with this in mind, plaintiffs have
28 failed to establish that these defendants are employers under the

                                    9

1  FLSA.

2       It is undisputed that the most "powerful" of these
3  defendants could make civil appointments, appoint employees to
4  work in the Transportation Unit, and participate in the
5  collective bargaining process with the CCPOA.  It is also not in
6  dispute that many of these defendants, as supervisors and
7  managers, set plaintiffs' schedules, assisted in the drafting of
8  employee handbooks, approved "post orders," recommended or
9  reviewed the termination of other employees, and maintained
10 employment records for the CDC.

11      Considering the economic reality of the circumstances
12 here, a crucial aspect of control is missing.  Despite their
13 varying degrees of participation in the day-to-day work
14 environment of these plaintiffs, none of these defendants
15 "control the purse strings" that support plaintiffs' jobs.  See
16 Bonnette, 704 F.2d at 1470 (finding that power over the
17 employment relationship by virtue of control over the purse
18 strings is a substantial factor in identifying an employee-
19 employer relationship).  In this instance, the State maintains
20 all of the control.

21      An example of the absolute control that the State has
22 over the salaries of its employees, including plaintiffs, can be
23 found in Biggs v. Wilson, 1 F.3d 1537 (9th Cir. 1993).  In Biggs,
24 the plaintiffs, California highway maintenance workers, were
25 suing then Governor of California, Pete Wilson.[7]  The Ninth

26

27      [7]  Biggs v. Wilson, was decided prior to Seminole Tribe,
28 514 U.S. 44, and Alden, 527 U.S. 706.  Accordingly, at that time
   the State and its officials, in their official capacity, were

1 Circuit held that the state's failure to issue plaintiffs' pay
2 checks on their regularly scheduled pay day, in that case July
3 16, 1990, was a violation of the FLSA.

4         The reason for the delay in the issuance of plaintiffs'
5 checks was that "[i]n 1990, State law prohibited the release of
6 paychecks until a budget was approved by the Legislature and
7 signed by the Governor." Id. at 1538.  Thus, until the state
8 legislature passed a state budget on July 28, and it was signed
9 by the Governor on July 31, not a single state employee received
10 a pay check.  Id.  That a state-wide budget impasse in the
11 legislature could prevent all state employees from receiving
12 their paychecks indisputably demonstrates the "economic reality"
13 of being a state employee:  the State, not your supervisors or
14 managers, is your employer, and it is the State that determines
15 when, or even if you will receive a paycheck.

16         Another example of the State's control over the working
17 environment of all state employees can be found in the current
18 action.  Here, the parties have submitted as an "undisputed fact"
19 that when defendant Kessler wanted additional personnel to assist
20 the Administrative Office in the manual calculation of overtime
21 for the Transportation Unit, the State refused his request.
22 Kessler was informed that the State was experiencing a $50
23 million budget deficit requiring a state-wide hiring freeze.
24 Thus, unless Kessler could prove a 20% vacancy rate in the entire
25 accounting office, including eight regional offices, he would not
26 be allowed to hire any more employees.

27 _____

28 proper defendants in an FLSA action.

11

The hiring freeze instituted by the State clearly had a dramatic effect on the work environment of CDC employees, and apparently none of these defendants could temper that effect. For example, as a result of the state-wide hiring freeze, the workload at the Administrative Service Division became "unacceptable," and employee morale was low.  As a result, the Administrative Service Division had a 20-25% vacancy rate, which defendant Kessler, even as the director, could not fill.  See Donovan, 712 F.2d at 1514 (finding that corporate officers with significant ownership interest who personally made decisions to continue operations despite financial adversity were employers under the FLSA).

In light of these circumstances, defendants cannot be considered employers for the purposes of the FLSA.  See Bonnette, 704 F.2d at 1469 (reiterating that the determination of an employee-employer relationship does not depend on "isolated factors but rather upon the circumstances of the whole activity").  Congress could not have intended to hold individuals personally liable for alleged violations of the FLSA when those individuals cannot even control crucial aspects of the work environment such as when and if paychecks will issue, how many employees are necessary, and whether or not more employees can be hired.

Moreover, in the present action, by suing the defendants in their individual capacity plaintiffs have attempted to effectively sever these "managerial" defendants from the corporation, i.e. the State.   Unlike an action against a private corporation, however, the court cannot find these defendants

1 jointly and severally liable with the State, not only because the
2 State is not a party to the action, but because the State *could*
3 not be a party to the action under the Eleventh Amendment. <u>See</u>
4 <u>Donovan</u>, 712 F.2d at 1511 (finding that officers of corporations
5 found to be liable under the FLSA are jointly and severally
6 liable with the corporation). Consequently, if the court were to
7 find in favor of plaintiffs in this action, without the State as
8 a party, the court likely could not give the FLSA its intended
9 remedial effect because these individual defendants, without the
10 funds of the State, are unlikely to be able to provide the relief
11 plaintiffs are seeking.

12 This court does not believe that Congress intended to
13 make each individual manager and officer within a business,
14 public or private, personally liable for violations of the FLSA,
15 when a manager or officer cannot control the very things which
16 may lead to violations of the FLSA. Such a rule would discourage
17 rather than encourage men and women from working hard, in an
18 effort to "move up" the ranks toward "better" jobs. Accordingly,
19 the court finds that these defendants are not employers under the
20 FLSA, and thus cannot be held personally liable for any
21 violations of the FLSA. As discussed below, the reality of this
22 suit is that plaintiffs are attempting make an end run around the
23 Eleventh Amendment by lining up the chain of command in the CDC,
24 purport to sue them in their individual capacities, and say that
25 "someone ... should shoulder the responsibility." (Pls.' Reply
26 Brf. at 12:9-10).
27 ///
28 ///

13

1    C.   Eleventh Amendment Immunity

2         Plaintiffs here have attempted to circumvent sovereign

3    immunity by suing these state officers in their individual

4    capacity.   Alden, 527 U.S. at 757; (see discussion supra § III.

5    A).   Thus, even if the court were to find that these defendants

6    were employers under the FLSA, the court would still be obliged

7    to consider whether the action, is "really and substantially" an

8    action against the state.   Idaho v. Coeur d'Alene Tribe of Idaho,

9    521 U.S. 261, 270 (1997); Greater Los Angeles Council on

10   Deafness, Inc. v. Zolin, 812 F.2d 1103, 1110 (9th Cir. 1987).

11        This court agrees with the Fourth Circuit's

12   determination, that "if a statute treats an individual state

13   employee as the employer, the real party in interest is in

14   reality the state itself."   Montgomery v. Maryland, No. 00-2099

15   2001 WL 1135110 (4th Cir. 2001) (citing Luder v. Endicott, 253

16   F.3d 1020, 1022-23 (7th Cir. 2001)); see Lopez Rosario v. The

17   Police Department, 126 F. Supp. 2d 167, 171 (D. Puerto Rico 2000)

18   (citing Hale v. State of Arizona, 993 F.2d 1387, 1399 (9th Cir.

19   1993) (finding that "the conduct complained of 'is not personal,

20   and money damages for wages due would be paid out of the state

21   treasury ....'").   Accordingly, even if this court were to find

22   that these defendants were employers under the FLSA, the matter

23   would be dismissed on the ground of sovereign immunity because

24   the state is the real party in interest.

25        D.   Waiver of Immunity As An Affirmative Defense

26        Plaintiffs argue that defendants have waived their

27   right to raise the Eleventh Amendment as an affirmative defense

28   to this action.   The Eleventh Amendment "'does not implicate a

14

federal court's subject matter jurisdiction in any ordinary sense' and 'may even be forfeited by the State's failure to assert it.'" <u>Hill d/b/a/ American Sewing & Bag Co. v. Blind Industries and Services of Maryland</u>, 179 F.3d 754, 760 (9th Cir. 1999) (quoting <u>ITSI IV Prods. Inc. v. Agricultural Ass'ns</u>, 3 F.3d 1289 (9th Cir. 1993)). Specifically, a state may waive its sovereign immunity by its conduct during litigation. <u>Hill</u>, 179 F.3d at 759 (finding that waiting until the day before trial, after a jury has been selected is a waiver of sovereign immunity).

Further, sovereign immunity cannot be used to gain an improper tactical advantage or as an "offensive shield." <u>Watkins v. California Dep't of Corrections</u>, 100 F.Supp. 2d 1227, 1230-231 (C.D. Cal. 2000). Thus, the state cannot assert the defense of Eleventh Amendment immunity after it has already litigated the merits of an action. <u>See Hill</u>, 179 F.3d at 756-57 (finding that "the integrity of the judicial process is undermined if a party, unhappy with the trial court's ruling or anticipating defeat, can unilaterally void the entire proceeding ..."); <u>see also Spignola v. Regents of the University of California</u>, 2000 WL 1780260 (N.D. Cal. 2000) (finding that the state's conduct did not "demonstrate an unambiguous intent to waive immunity because the state has not previously litigated the merits of its case before the summary judgment motion).

Here, defendants asserted Eleventh Amendment immunity as an affirmative defense in their answer. Because it was not obvious from the face of the complaint whether they were effectively being sued in their official or individual capacity,

1  it was not until after close of discovery that defendants felt

2  they could support a defense of sovereign immunity.[8]  Thus,

3  defendants have not unambiguously waived their right to assert

4  the defense of sovereign immunity under the Eleventh Amendment.

5       IT IS THEREFORE ORDERED that plaintiffs' motion for

6  summary judgment that defendants violated the FLSA be, and the

7  same hereby is DENIED.

8       IT IS FURTHER ORDERED that defendants' motion for

9  summary judgment be, and the same hereby is GRANTED.

10  DATED: November 6, 2001

11                                WILLIAM B. SHUBB

12                                UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

_____

26  [8]     Presumably this is also why defendants did not file a
   motion challenging jurisdiction after this court's status order
27  instructing them to file all such motions within 30 days.
   Whatever drove defendants' decision to disregard the court's
28  November 3, 2000, status order, that choice was not made with the
   unambiguous intent of permanently waiving the defense.

16

United States District Court
for the
Eastern District of California
November 7, 2001


* * CERTIFICATE OF SERVICE * *


2:00-cv-01619


Baird

    v.

Kessler

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  November 7, 2001, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.


        Joel Herbert Levinson                SH/WBS
        California Correctional Peace Officers Association
        Legal Department
        755 Riverpoint Drive
        Suite 200
        West Sacramento, CA  95605-1626

        Edmund K Brehl
        California Department of Personnel Administration
        Legal Division
        1515 S Street, North Building
        Suite 400
        Sacramento, CA  95814-7243


                            Jack L. Wagner, Clerk

                        BY: _____
                            Deputy Clerk